On Rehearing.
The contract, for the non-fulfillment of which this suit is brought, was to the following effect:
Plaintiff agreed to deliver to defendant the cane to be raised by him on 260 acres of-land, estimated at about 5000 tons, at the rate of about 75 tons per day, beginning on, or about, October 25, 1894, for which the defendant agreed to pay “f. o. b.” its side track, at the rate of ninety cents per ton, for each cent that prime yellow clarified sugar should be quoted in the New Orleans Sugar Exchange, to which was to be added the bounty “if, and when paid”. Settlements to be made weekly.
The concluding clause in the contract reads thus:
“It is further understood and agreed, by all the parties hereto, that, “ should the machinery of the party of the second part become disabled, “ or any other accident delay manufacture, or cause a suspension, or “ partial suspension, of sugar making, by said, 'The Bs ton Rouge Sugar “ Company’, said party of the second part shall have the right and privi- “ lege, at their option, to stop the hauling and receiving of cane, in part, “ or wholly, during such suspension. Further, that, should the machin“ery of the Baton Rouge Sugar Company become permanently dis- “ abled, for the season, from making sugar, in consequence of fire, want “ of water, breakdown, labor strikes, or any other cause beyond the con- “ trol of the said, The Baton Rouge Sugar Company, then this contract “ becomes null and void, for all the cane not previously delivered * * “ * In case of failure to secure side track, this contract is void.”
The evidence satisfied this court, originally, that it was part of the contract that the defendant should furnish the cars, necessary to its execution, upon which the cane was to be loaded by the plaintiff, and transported, at his expense, to defendant’s side track, in Baton Rouge; and there has been no change of opinion upon that subject.
This conclusion disposes of that portion of the answer filed in which the defendant specially denies that it ever assumed, or had control of, the distribution of the cane cars, or was in any way responsible for the delivery of the plaintiff’s crop.
The next ground of defense is that the plaintiff actively violated his contract by refusing to ship his cane. We will pretermit this for the *1675 present and examine the other ground, which is stated in the answer as follows:
“Further answering, respondents show that said contract provides: “ ‘ That should the machinery of the Baton Rouge Sugar Company be- “ come permanently disabled for the season from making sugar, in con- “ sequence of fire, want of water, labor strikes, or any other cause, be- “ yond the control of the said, The Baton Rouge Sugar Company, then “ this contract becomes null and void, for all cane not previously deliv- “ ered’; that on or about the 17th day of December, 1894, after the vio- “ lation of the said contract by the plaintiff, as above alleged, owing to “ the settling of the defendant’s factory, produced by the development “ of springs under the foundation, the continued operation thereof was “ rendered dangerous and impossible, and respondent Was compelled to “ close said factory”.
It is true that, according to the language thus quoted, the permanent disabling, at any time, and from any of the causes mentioned, of the defendant’s machinery, annulled the contract as to all cane not previously delivered; but the different parts of the contract must be taken together, and the provisions here relied on by the defendant must be interpreted with those which, as understood and construed by the court, contemplate that the plaintiff should deliver 75 tons of cane per day, from about October 25th, upon cars to be furnished by the defendant. Assuming, then, that the settling of the factory was a permanent disabling of the “machinery " within the meaning of the contract, it could only have the effect of annulling the contract as to such cane, not previously delivered, as had not been delivered by reason of the laches of the plaintiff, or for some reason for which the defendant was not responsible. In other words, let us suppose that the plaintiff was ready to begin the shipment of his cane on, or about, October 25th, at the rate of 75 tons per day according to his contract, but that the defendant furnished him no cars, or refused, without valid reason, to receive his cane, and that he had been unable to make any delivery, whatever, until the grinding season was practically over; and that, then, at the last moment, the defendant’s machinery was permanently disabled; would such disabling relieve the defendant from liability for the loss sustained by the plaintiff by reason of the non-delivery of cane, which, if permitted, he might have delieved, before it occurred? Clearly not! The right of the defendant “to stop the hauling and receiving of cane”, was not ab *1676 solute and arbitrary; it depended upon tbe existence of certain conditions ; in the absence of which, it was as much the right of the plaintiff to deliver seventy-five tons of cane per day, as it was of the defendant to demand such a delivery. Before dealing with the effect of the “settling” of the factory then, let us consider what had taken place before that time.
It is not pretended that any cars, upon which to ship his cane, were furnished to the plaintiff upon the 25th of October, and it is not denied that he was then ready to begin such shipments, if the cars had been furnished. The reason that the cars were not furnished, and the only reason, so far as the record shows, was that the defendant’s arrangements for receiving and grinding the cane had not been completed. A week later, on November 1st, eight cars were placed at the plaintiff’s disposal. This was three more than his contract contemplated, and three more than he was prepared to handle. ITe, accordingly, loaded five of them, and allowed the others to be taken elsewhere. On November 6th, he received and loaded five cars; on the 7th four cars; on the 8th three ears; and, on the 10th of November, four cars. In seventeen days, therefore, counting from October 25th, he had received 17 cars, instead of 85, and had been able, to ship 313 tons of cane, instead of 1275 tons as called for in his contract; whilst the labor employed by him, to cut and load seventy-five tons per day, was kept comparatively idle, at his expense. The plaintiff got no cars on November 11th, and none on November 12th, but, on this latter date, he received a letter from the defendant saying:
“We have had considerable trouble in getting our machinery to a “ working basis, and have remedied all defects, so far as we can find “ them, and are now anxious to clear up all cane on hand. .Please dis- “ continue shipping until further notice, which will only be, we think, “ a day or two. This will give us an opportunity to unload cars, and “ arrange for better railroad service for you.”
About this time, a young man, named Malarcher, who had a small crop, amounting to 575 tons of cane, which he had contracted to deliver to the defendant, became concerned about his interest, and went to Baton Rouge, to find out why his cane, and that of his neighbors, was not being taken. He testifies that he found Baton Rouge, and all the switches from there to White Hall, choked with loaded cars, and the defendant’s mill grinding, *1677 as he thought, about 125 tons of cane per day. He therefore concluded that the defendant would not be able to take all the cane that it had contracted for; and, that he was not wide of the mark, is evident, for we are informed by Mr. Webb, its vice-president and general manager, that it had contracted for 16,000 tons, and he does not pretend that the factory was able to work up more than 200 tons per day, as an average. So that, taking his statement, it would have been well on towards the end of January before his company could have finished grinding all the cane it had agreed to take, whilst, if Malarcher’s estimate of the amount of work being done is correct, it would not have finished until late in the spring or early summer. Mr. Webb appears to have realized the situation, and told Malarcher that he would not object to the planters, with whom his company had contracts, shipping elsewhere, during the time that he was unable to take their cane, in fact, he wanted them to dio everything they could to save their crops, “only asking (to quote “ his language) that, when we got through with the cane on hand, and “ were able to take their cane, they would come back, as per the terms “ of their contracts.”
This was the report that Malarcher brought back to the plaintiff’s neighborhood, giving his own estimate of the amount of cane which was being worked up, which estimate was doubtless nearer correct than that given by Webb in his testimony, since Webb knew absolutely nothing about the sugar business, and makes no pretense that he knew anything.
Beyond this, after the letter of November 12th, telling him to ship no more cane until further notice, the plaintiff heard nothing from the defendant until November 16th, when he received a letter referring to a bill for the construction of the side track used by him, and concluding as follows: “We hope to have you cars. Will be cleared up and ready for business early part of week.” But the early part of the week came and passed, and there were no cars. The plaintiff’s position, in the meanwhile, was becoming serious. Estimating his crop at 5000 tons, ho had still about 4700 tons in the field, which, at the rate of 75 tons per day, it would take until late in January to ship to the mill, whilst the evidence shows that most planters in that part of the State prefer to finish grinding by the first of January, and that, to be belated to the latter part of the month, is to be subjected to great risk. Moreover, there was nothing in the plaintiff’s experience to justify the belief that *1678 the defendant would thereafter be able to receive 75 tons per day, since he had been able to ship only 313 tons, up to that time, so that the outlook promised certain disaster, if not ruin. In this situation, he entered into an arrangement, terminable at the will of either party, with Mr. LaPlace, who controlled a mill of large capacity, agreeably to which he began shipping cane, at a reduced price as compared with his contract with defendant, to LaPlace, on November 23rd, and, with some interruption, continued shipping to him until December 17th, when the cane train was withdrawn by the railroad company, and the arrangement necessarily fell through. And, upon the same day, December 17th, defendant definitely and finally notified him, that it would receive no more cane.
The evidence shows that the plaintiff had shipped, all told, 2060 tons of cane, i. o. 313 'tons to the defendant, and 1747 tons to La Place; and his condition seemed, now, almost hopeless. Fortunately, about that time, his neighbor, Mr. Himel, finished grinding his own crop, and loaned the plaintiff his sugar house, mules and carts, in order to aid him in his extremity. Mr. Himel’s mill was, however, a three-roller mill, and whilst plaintiff avers in his petition, that he ground 1350 tons of cane, he testifies that there was no profit in it, because of the comparatively small yield from a mill of that kind, and for other reasons, which need not be considered, as he makes no claim for loss on account of the cane thus ground. Upon February 14th, grinding at Himel’s mill was stopped by a snow, which put an end to all sugar making in that part of the State, leaving plaintiff, as 'he claimed, with more than 2000 tons of cane, which he had been able neither to sell nor to grind.
It is necessary now, to go back to the period, prior to December 17th, when defendant notified plaintiff that it would receive no more cane; and inquire why it was that it had taken only 313 tons, up to that date. The evidence shows that shipments to defendant’s mill, which, prior to November 12, had been irregular, because of the failure of the defendant to furnish cars, were, upon that day, entirely discontinued, by reason of the defendant’s notice that it could not receive them. It is not claimed that any such notice was given, and it is not pretended that any attempt was thereafter made to furnish the plaintiff with cars, until December 1st, or that any ears were actually furnished until December 3rd. From October 25th, therefore, to December 3rd, inclusive, there were thirty-nine days, during which the plaintiff, under his con *1679 tract, might have delivered, at say 75 tons a day, 2925 tons of cane, and, according- to the testimony, he was ready to deliver it, and failed to deliver it only because the defendant refused to receive it, or failed to furnish the necessary cars. The question is, was this failure and refusal justified by the terms of the contract?
We learn from the testimony of Mr. Webb, that a cylinder head was blown out on the 2nd or 3rd of November, causing a loss of two days’ time; that, about the 15th or 20th of November, some flues burned out, causing a loss of four or five days, and that there were “several small breaks”, causing from two to ten hours’ delay each. No other causes for delay, within the terms of the contract, appear from the evidence. But it does appear, plainly and unmistakably, that all other delay was attributable to imperfect arrangements for, and ignorance on the part of the defendant’s agents of the business which the defendant had undertaken to conduct, and the entire loss resulting from which it now seeks to impose upon those with whom it contracted. Allowing all that is asked for the accidents to the cylinder head and the flues, and for the small breaks — say an aggregate of ten days, there were still twenty-nine days during which plaintiff might have delivered 2175 tons of cane instead of the 313 tons, which he was allowed to deliver up to the third of December.
Pretermitting, for the moment, the question of the opportunity afforded to the plaintiff for delivering cane between December 3rd and December 17th, let us now deal with the defense that the closing of the mill on the date last mentioned was justified by the settling of the building. By its terms, the contract was to become null in the event that the “machinery” became "permanently disabled, in consequence of fire, want of water, breakdown, labor strilces, or any other cause, beyond the control of the defendant.” It does not appear to have occurred to the contracting- parties to add, that the contract should become null, if the building- provided by the defendant should be unfit for the purpose for which it was intended, and it may, reasonably, be questioned whether it would be altogether just to the plaintiff that such a condition should now be imposed upon him, for the purposes of this suit. Aside from this, the facts disclosed do not sustain this defense.
Mr. Webb, the defendant’s vice-president and general manager, testifies that, about the middle of November, he discovered that the building was settling, and that he got his carpenters and mill hands together *1680 and braced it; that it nevertheless continued to settle, and that, about the middle of December, it had reached a point when he considered it dangerous; that he then called in Major Pruyn, an expert in such matters, who confirmed his apprehensions, and told him that the structure was liable to collapse at any moment, and that the trouble could not be remedied, “so as to make it safe, in less ¡|han sixty or ninety days." He further says that he made a thorough investigation, and became satisfied that there was no help, and that, as they were working a good many men, and he did not want to be tried for murder, he decided to shut down the house. Major Pruyn was, however, also examined as a witness, and there was filed in evidence his written report upon the condition of the building, based upon the examinations made, at the request of Mr. Webb. This report bears date December 1, 1894, and begins with these words, to-wit: “I have this day visited your sugar house and examined your building”; and then the writer proceeds to state, that he had found two “carbols” in the basement badly shattered; that the wareroom had settled fully two inches; that a beam in the hot room was splintered; and that the building was very unsafe and liable to collapse at any moment, if additional weight should be added, which, he says, would be necessary unless the manufacture of sugar was stopped; and he gives his advice as follows: “I would suggest that you shut down at once, and work off the syrup in the tanks, and the sugar in the hot room as fast as possible, and then proceed to properly brace the house. In my judgment, it would require three weeks to brace the house, and put it in proper shape to bear the load you contemplate, after the sugar and syrup now inside are taken out. I would also state that, from calculations I have made, I think that you certainly have a million pounds on your piers, which are fourteen feet apart, and which sustain all the weight.”
It is not a fact, therefore, as stated by Mr. Webb, that he called in Major Pruyn about the middle of December, nor is it a fact that Major Pruyn advised him that it would take sixty or ninety days to brace the building, nor yet, is it a fact, that, not wanting to be tried for murder, he shut down upon receiving- Major Pruyn’s report, since that report was made December 1st, and he did not shut down until December 21st — some three weeks later, during which period, he by no means confined himself to working off the material on hand, but received,- and manufactured into sugar, cane from various shippers, as follows: from *1681 LeBourgeois, 59 cars; from Ory, 29 cars; from Levert & Donaldson, 11 cars; from Ory and Read, 8 cars, and from Malarcher, 13 cars. And not only was this the case, but, upon the same day upon which Major Pruyn made his examination and report, he gave written instructions to the railroad officials to resume the delivery of empty cars to the planters with whom the defendant had contracted, in order that they might resume their shipments of cane. And it was in consequence of this action that the persons named above resumed their shipments^ and continued them until December 17th, when they were notified that the defendant would receive no more cane, not because the building had settled, but for reasons, as thus stated: “The defects in certain parts of our “plant render it impossible to make any further attempt to take off “ this season’s crop. The makers of the defective machinery claim that “ it would lake sixty or ninety days to remedy our present trouble, mak- “ ing il too late for this season’s work. * * * We will be unable to “ receive any more cane from you.”
This record will, however, be searched in vain for evidence as to the existence of defective machinery at that time, or of any claim by the makers of such machinery, or any one else, that it would take sixty or ninety days to remedy any defects, of any kind, in the plant.
Some explanation would seem to be needed, upon the subject of the continued operation of the mill after the report made by Major Pruyn upon December 1st, for, notwithstanding the letter of December 17th, the mill was operated until the 21st of that month. That explanation is afforded by Major Pruyn’s testimony. He says that he found water all around the basement; that the interior supports (upon which the million pounds, mentioned in his report, rested), consisted of piers, fourteen feet apart, which were insufficient to support the veight imposed upon them, that a solid wall should have been put in, in place of the piers; that if the water had been diverted, the foundation would not have given way, and that, if the weight had been evenly distributed, the settling would not have rendered the building dangerous. He further testifies that the remedy suggested by him, at the time, was “extra posts”, and he says: “I drew a sketch, and gave it to Mr. Webb, but he did not follow out that sketch j but he put extra posts into it, which did just as well as if he had followed out my sketch
We therefore learn, from the expert who was consulted by defendant, that the trouble with the building, arose, rather from commonplace bad *1682 construction, than from the phenomenal and uncontrollable springs to which that trouble is now attributed. We also have from this witness, the statement of a fact, which might suggest itself toi any person of ordinary intelligence, to-wit: that, if it is found that piers, which arc overweighted, are settling, and it also appears that the ground upon which they rest is covered and saturated with water, the natural thing to do is to drain off the water. And yet, we are 'told by Mr. Webb that that idea did not occur to him until 1896, when he caused a small drain to be put in, since which, he appears to have had no further trouble from that source.
The explanation of the continued operation of the plant, after December 1st, then is, that the danger was provided against by the putting in by Mr. Webb, of extra posts, not exactly as recommended by Major Pruyn, but in some way, “that did just as well” as though the sketch by that gentleman had been followed; and hence, that when the plant eventually shut down, on December 21st, it was not because of the settling of the building, but for other reasons.
This view of the matter is strengthened by still other circumstances. Thus, notwithstanding Major Pruyn’s report of December 1st, Mr. Webb wrote to plaintiff on December 6th, that the great source of the trouble had been discovered, and that it was “in working cane cut too long and too high”, following which, was his letter of December 17th, being the last one written by him on this business, in which he speaks of defective machinery, but says never a word concerning the settlement of the building.
Demming, who had charge of the construction of the plant, and of its operation, for a while, withdrew early in the season, and brought suit on his contract of employment. To this, the defendant filed an answer, gratuitously sworn to by Mr. Webb, in which it denied liability, upon the grounds, that, by reason of the unskillful construction of the plant, it was unable to operate, at all, during the most active part of the season, and obtained only the most meagre results when it did operate; that its shutting down was rendered necessary by reason of the plaintiff’s incompetent supervision and construction, and of his abandoning his position, and leaving the defendant “without a shilled head", to take his place; that defendant had -been induced through fraudulent misrepresentation, to buy a clarifier from plaintiff, which failed to do its work, and occasioned great loss, etc.
*1683 In his testimony, in the case before us, Mr. Webb says that he was mistaken in his estimate of Mr. Demining and his clarifier, thus given in his sworn answer, and that he made affidavit thereto, because his attorney asked him to do so, and he “supposed it was part of the proceedings”. Accepting this explanation, the fact remains that Mr. Webb may be mistaken, and tbat he can be very positive in his errors, and the fact also remains, and is placed beyond question, that the plant was left, early in the season, without a skilled-head to operate it, and that it was unequal to the work which had been undertaken. The trouble arising from the lack of skill and experience is made manifest from the admission of the defendant’s representative, in various letters written by him and in his evidence on the trial, from which it appears that there was, from the beginning, miscalculation, or no calculation, as to the quantity of cane which could be consumed in the daily operation of the mill, and as to the handling of the loaded cars, so that the factory was chronically in a state of congestion; a large proportion of the cane turned sour before it was ground; and both time and money were lost in the attempt to make sugar from the sour cane. In this connection, it is significant that, whilst for the season in question, the defendant had contracted for 16,000 tons of cane, it contracted, the next year, for a much smaller quantity, and ground only about 3500 tons, although it claims to have improved its plant in the meanwhile.
Our conclusion, therefore, after a re-examination of this ease is, that the defendant failed, from the beginning, to comply with its contract, not so much by reason of any of the conditions provided for therein, as because of the ignorance and lack of experience of its representatives; and that it discontinued operations before the close of the season, not because of the settling of the building, but because, having no skilled head in charge, and the capacity of the plant having been overrated, it found that it was not only inflicting loss upon others, but was losing money itself.
Reverting now to the contention that the plaintiff is not entitled to recover, because, as alleged, he refused to ship his cane to defendant; the circumstances under which he began his shipments to La Place have been stated, and there is no complaint as to his action in that respect up to December 3rd, at, and after which date, up to December II, it is claimed that he might and should have shipped his cane to the defendant, and that, not having done so, his entire claim should be dismissed. *1684 The proposition, as stated, involves, we think, a non sequiiur. If, in the course of the execution of the contract, the plaintiff failed to ship cane to the defendant which he might have shipped, and ought to have shipped, he should not be allowed to recover for loss resulting from the non-shipment of that particular cane; and so, if the plaintiff, on being requested, in November, to discontinue his shipments, until further notice, had accepted the situation, as far as the past was concerned, and had announced to the defendant that he considered the contract off, and would go no further with it, it might well be argued that he would have no claim at all for damages. But if, upon the other hand, the plaintiff, in the course of the execution of the contract,- merely failed to ship a certain quantity of cane, and the defendant sustained no loss thereby, and claims none, whilst the plaintiff sustained serious loss by reason of the defendant’s failure to execute the contract as a whole, which execution the plaintiff continued to demand, there would seem to be no sound reason, considering the peculiar circumstances of the case, why the defendant should not make good the loss, resulting from its fault and failure, and to which the plaintiff did not contribute. Applying this reasoning to the facts, there is no doubt that the defendant, upon November 12th, requested the plaintiff to discontinue shipping until further notice; and it is also true that specific notice to resume shipment was not sent, and that, whilst plaintiff was informed, on November 29th, that the tracks were opened, no cars were furnished him until December 3rd. From this latter date, however, the plaintiff may bo fairly considered to have known that the defendant was receiving cane, and, as it was within his power to have controlled the destination of the empty cars which were, thereafter, delivered at his siding, for his use, he could as readily have sent them, when loaded, to the defendant’s mill, as to La Place, and he is not, therefore, entitled to recover for loss resulting from his failure to avail himself of the opportunity thus afforded.
Upon the other hand, neither the remarks made by the plaintiff, to the flagman of the railroad, and to others, concerning the defendant and his relations with it, nor the fact that he continued shipping to La Place, ought, under the circumstances, and when considered in connection with his direct communications with the defendant, to be regarded as an abandonment of his rights under his contract. The conduct of the defendant had placed him, and kept him, in a position of uncer *1685 tainty and financial peril such, as no naan could be expected to endure with equanamity, and his irritation manifested itself by his shipping some car loads of cane to La Place, which he might have shipped to defendant, and in the use of language which would ordinarily have been left unuttered. These shipments, however, occasioned the defendant no loss, and plaintiff’s language was not addressed to the defendant or to any of its agents. What he had to say, and did say, to them, was, that he was waiting for notice to resume his shipments of cane, and expected the defendant to comply with its contract, and he said that, in writing, and by means of letters dated November 28th and December 3rd, respectively.
The remaining question, then, is one of amount. Plaintiff sold 1747 tons of cane to La Place, at a reduced price and thereby lost $1009.31, but, of that quantitsq there were 46 car loads, or say 690 tons, shipped between December 3rd and December 17th, which might have been shipped to defendant; so that the amount of the loss for which defendant is liable, being proportionately reduced, is $610.67.
He claims to have lost 1932 tons, which were left in the field, wind-rowed or standing. This is the estimated product of 69.3 acres, which he was unable to sell or grind, upon the basis of 28 tons to the acre. The balance of his crop, produced on the 19.7 acres, amounted to 3206 tons, being a fraction over 16 tons 81 pounds to the acre, wdfich, from the testimony of disinterested witnesses, is regarded as a fair yield in that section of the State. Plaintiff claims that the 69.3 acres, the product of which was lost, was his best land, but he does not explain why it was that, with the difficulties surrounding him, he left his best cane in the field until the fourteenth of February, and used his opportunities in grinding the poorest. He will be allowed to recover (upon the basis of 16 tons 81 pounds to the acre) for 1111 tons and 1410 pounds at $2.70 per ton, less 60 cents per ton freight, and 30 cents per ton, difference between cost of getting rid of spoiled cane and loading good cane on cars, thus leaving $1.80 net per ton, or a total of $2000, which, added to the $610.67 lost on cane sold to La Place, makes $2610.67.
Beyond this, the plaintiff makes a claim for bounty, but we fail to find that he is entitled to recover it from the defendant, since the latter has not collected it, and the plaintiff was informed, when he made the contract, what would be done in order to collect it, and ought to have known better than Mr. Webb, who was inexperienced, whether the meas *1686 ures proposed were sufficient or not. If the bounty should be collected, the plaintiff would be entitled to it, and his rights in that respect will be reserved, as they were by the judge a quo.
For these reasons it is ordered, adjudged and decreed that the judgment appealed from be annulled, avoided and reversed, and that there now be judgment in favor of the plaintiff, Albert Sidney Vredenburg, and against the defendant, The Baton Rouge Sugar Company, for the sum of with interest thereon, at the rate of 5 per cent, per annum, from judicial demand until paid, and with reservation of his rights with respect to the bounty herein claimed; the defendant to pay all costs.
Breaux, J., dissents.